## Case No. 9,588.

### MILLER v. The RESOLUTION.

[Bee, 404;[1] 3 Hopk. Works, 70.]

Admiralty Court, Pennsylvania. 1781.[2]

TREATIES—EFFECT OF ALLIANCE WITH FRANCE.

The United States, by their alliance with France were not considered as parties in the capitulation made by the Marquis De Bouillé with the inhabitants of Dominica.

In admiralty.

Before HOPKINSON, District Judge.

The ship Resolution, belonging to Brandlight and Sons, merchants in Amsterdam, sailed from the Texel on the 9th of January, 1780, bound for the island of St. Eustatius. This voyage was interrupted by stress of weather, which obliged her to put into Lisbon, where she remained some months to refit, but afterwards arrived at St. Eustatius. From St. Eustatius she sailed for the island of Dominica, where she arrived on the 1st of October, 1780. In March, 1781, she sailed from Dominica for Amsterdam, with a valuable cargo of sugar and coffee, shipped by sundry persons, certified to be capitulants in the island of Dominica; which cargo was consigned to Messrs. Brandlight and Sons, of Amsterdam, the owners of the

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

[2] [Affirmed in part and reversed in part, in 2 Dall. (2 U. S.) 1, 19.]

---

vessel. Soon after the commencement of her voyage from Dominica, she was captured by a British armed vessel, and taken as prize into Nevis, where Admiral Rodney examined her papers, and thereupon dismissed her. She again proceeded on her voyage, but was afterwards captured by another British vessel, from whom she was recaptured by an American privateer; from this privateer she was again taken by a British ship, and finally retaken from her by Peter Miller, the libellant in this cause, and sent into the port of Philadelphia. It is not contended but that in each and every of the captures and recaptures, she remained more than twenty-four hours in the possession of the conqueror. Being thus found in the hands of the enemy, and taken from them by force of arms, the libellants pray that both ship and cargo may be condemned as lawful prize and booty of war.

But it has been contended in behalf of the claimants, that it appears in testimony that the island of Dominica did on the 7th of September, 1778, surrender by capitulation, to the Marquis De Bouillé, general of the French forces in the Windward Islands; that by the terms of this capitulation, all the property and estates in Dominica, with their produce were secured to the inhabitants, and protected from confiscation; particularly by the seventeenth article, in these words: "The merchants of the island may receive vessels to their address from all parts of the world (English vessels excepted) without their being confiscated; and they may sell their merchandize, and may carry on their trade, and the port shall be entirely free for them for that purpose, paying the customary duties paid in the French islands." And it is alleged, that this privilege and protection was extended to absent persons having property or concerns in the island, by virtue of the ninth article of the same capitulation in these words: "The absent inhabitants, and such as are in the service of his Britannic majesty, shall be maintained in the possession and enjoyment of their estates, which shall be managed for them by their attorneys." That these United States being in strict alliance with the court of France, are bound by the terms of every capitulation, convention, or treaty, which the court of France, or any person or persons under that authority, shall make in the course of the war, the war being a common cause, and both allies principals in the conduct of it: that it was also in proof, that the king of England, by his proclamation, dated in December, 1780, extended the effects of the capitulation of Dominica, to Dutch vessels for four months, notwithstanding the rupture between Great Britain and Holland, by the capture of St. Eustatius: and, that this ship, under the sanction of the said capitulation which secured her and her cargo from capture by the French or Americans, and under the said proclamation, which

protected her from British capture, sailed from Dominica, with the property of capitulants on board; and that the passport of Monsieur Du Challeau, the French governor of Dominica, endorsed on the manifesto of the cargo, ought to protect this property from being made prize of by the friends and allies of France.

It has been further insisted, that a recaptor acquires no other right than what the captor had; inferring that as the British captor could not have procured a condemnation (as appears by the acquittal of Admiral Rodney) neither can an American recaptor make this vessel legal prize; that the British captain should be considered as a pirate, and that the law is, that goods taken by pirates, and again retaken from them, shall be restored to the former owner; that if it should be objected, that most of the real consignees of this cargo are not inhabitants of Dominica, and therefore not within the capitulation; it is answered, that article the ninth extends the operation of this capitulation to absent inhabitants, even such as are in the service of the king of Great Britain having property in the island, whose business may be transacted by attorneys; and that if the attorney is an inhabitant, and signed the capitulation, it is the same thing in effect as if the principal had done it. And lastly, that although no express authority can be produced to prove directly that allies in war are bound by the capitulations, conventions, and treaties of each other, reciprocally; yet a striking analogy may be found in the case of ransom. That it cannot be denied, but that if a French vessel takes a prize and ransoms her for a limited time, the ransom bill would protect the property from capture and condemnation by the Americans. If, therefore, the act of an individual captain of a French privateer can screen the property of an enemy from an ally, much more should the solemn capitulation of a French general with the whole inhabitants of a captured island bind the same ally.

To this it has been replied: that the ship Resolution and her cargo were found in the possession of the enemy, who held the same by force as their property for more than twenty-four hours, which brings the case strictly within the ordinance of congress of February last, which excludes any claims of former owners after a possession of twenty-four hours by the enemy: that we have no business to inquire by what right the enemy became possessed; it is sufficient for us that we found it there: that the doctrine respecting pirates does not apply, because the British, as a sovereign nation, has an undoubted right to wage war, and to take prizes, which pirates have not: that if any subject of a sovereign power takes unlawfully, let him or his prince answer the wrong, the captors at war with them being altogether blameless, whose right to take

from an enemy cannot be doubted: that it appears evidently by the letters and other exhibits in this cause, that this cargo is in fact British property, and not the property of the inhabitants of Dominica; and although consigned to merchants in Amsterdam, the net proceeds were to be remitted to merchants in London, and other parts of the British dominion: that it is absurd and untrue to suppose that the benefits of the capitulation were designed to extend to London merchants who had never been inhabitants of the island of Dominica, and who are and will remain British subjects, aiding, by their wealth and influence, in the war against France and her allies: that the capitulation included only real inhabitants, either present on the island, or absent on business at the time, and placed them in a state of perfect neutrality with respect to the war; a character which can by no means be applied to the real consignees of this cargo: that if the effects of this capitulation were to be thus extended, France would have obtained a conquest which can produce nothing but expense, trouble, and loss to her, but will tend to strengthen and enrich the enemy; and that it would be, for the present, the interest of Great Britain to surrender all her West India islands upon the same terms.

It has been further urged by the counsel for the libellants, that allies are not mutually bound by every ex parte treaty or convention: that consent is necessary to include one in the engagement made by the other; as for instance, in a truce or cessation of hostilities: that France does not deem herself so bound, is evident from her conduct with respect to Bermuda and the Bahama Islands, whose property congress have exempted from capture and condemnation by Americans; yet their vessels are confiscated in the French courts of admiralty: and that this exemption, granted by congress to Bermudians, runs strictly parallel with the terms granted by the French general to the people of Dominica, so far as allies in war were to be affected by such treaties. That the law respecting ransoms cannot apply to the present case, because, if, after our ally has made a capture, and discharged the prize on a promised ransom, we should violate the ransom bill, we should in fact plunder our friend of his actually acquired property; and it is for this reason that allies are bound by ransom bills: that this case coming precisely within the ordinance of congress respecting twenty-four hours' possession by the enemy. this court is bound to decree according to that ordinance, and hath no power to judge how far its operation may, or may not, under particular circumstances. affect the terms of our alliance with France, the true limits of which are only to be ascertained by the sovereignty of the states, and are not submitted to the determination of this court. That, as to the passport subscribed by Monsieur Du Challeau, he

did it as a matter of course in consequence of the depositions annexed to the bills of lading, which were taken by the British judge of the island, and who might probably be in the interest of the parties; or, at least, that it was done with the official negligence too usual in passing customhouse papers. It was further suggested, that the manifest variance between the bills of lading, with their depositions annexed, and the private letters of advice found on board; the direct fraud manifest in some of those letters, and the mysterious complexion of others, are alone sufficient to justify a condemnation of this property; double papers and fraudulent clearances being legal cause of confiscation. In short, that this whole business appears to be a mercantile scheme concerted between British merchants and Brandlight and Sons, of Amsterdam, in conjunction with the shippers at Dominica, to impose on the French governor, and to derive an unfair advantage from the liberal terms of the capitulation: that, if this property is to be deemed neutral, the true doctrine is, if a neutral voluntarily puts his property on board an enemy's ship, he does at his own risk; but if an enemy unjustly takes neutral property, and the same is retaken, the remedy is against the enemy who did the wrong, and not against the recaptor who only did his duty; that it is true, that the passport of Governor Du Challeau recommends this vessel to pass unmolested by the friends of France, but does not say she shall not be taken from the enemy in case she should fall into their hands: that if the inhabitants of Dominica. in their present situation, be considered either as French or as British subjects, still the recapture is good; if French, then the property (supposing it to belong to the shippers) having been more than twenty-four hours in the possession of the enemy, is prize to the recaptor by the marine ordinances of France and America; if British, it belonged to the enemy, and is therefore prize. And lastly, that this capitulation should not be construed to extend further than the protection of property upon the island, and within its ports and harbours, but cannot reasonably be expected to insure safety on the high seas in the midst of a raging war.

This cause, so far as it respects the cargo of the ship Resolution, rests principally on one question, viz. whether the United States by their alliance with France, are, or are not to be considered as parties in the capitulation made by the Marquis De Bouillé with the inhabitants of Dominica. No authority has been produced, and I believe that none can be, to shew that allies are mutually bound in all cases. It is manifest, that it is not generally so understood; because it is usual in forming treaties of alliance to insert special clauses specifying those cases, wherein the promises and engagements of the one shall bind the other: for it would be a very dangerous doctrine that should bind sovereign powers in engagements to which they had neither expressly nor implicitly given consent, or that one ally should necessarily become a party in the conventions which the generals and officers of the other may, under particular straits and circumstances, make with the common enemy, unless the ally be mentioned in the convention, and the terms thereof be afterwards acceded to by him. Thus, in the case of Dominica, had Governor Stuart, when he surrendered the island to the Marquis De Bouillé expected that the United States should be bound by the terms of the capitulation, he would have made this one of the articles, and not entrusted so important a point to a speculative question, how far one ally may or may not be virtually bound by the engagements of the other. This, however, he has not done, either because it would imply an acknowledgment of the sovereignty of the United States, or because he deemed the objects of the capitulation to be limited to property within the island. Be this as it may, the British could not reasonably complain that the French had violated the articles of the capitulation, should the Americans take the goods of the inhabitants of Dominica found upon the high seas, because such an assurance made no part of the stipulation. "If he who can and ought to have explained himself clearly and plainly, has not done it, it is the worse for him; he cannot be allowed to introduce subsequent restrictions which he has not expressed." Vatt. Law Nat. bk. 2, c. 17, § 174. But whatever doubts there may be of the right of Americans to take the property of the people of Dominica under the present circumstances, there can be none of taking British property, wherever found, without any danger of impairing the friendship of our good ally. And from a scrutiny of the papers found on board this vessel, there is strong reason to believe that this cargo, however artificially covered, is, in fact British property.

As to the general doctrine respecting allies, the case of Bermudas is, I think, strong in point. The vessels of that island were by congress exempted from capture by Americans, and yet the French made prize of them whenever they could; nor was it ever suggested that they had thereby violated the faith of the alliance. Had the British expected, or France desired, that the United States should be parties in the capitulation of Dominica, it cannot be doubted. but that this would have been made one of the terms of that capitulation, or that France would, before this. have signified her desire to congress. and that congress would have instructed the masters of privateers as to this matter. Having made no national agreement to spare the property of the people of Dominica, when found on the high seas, much less are we bound to rescue it from the hands of an enemy at our risk and expense, in order to restore it, salvage free, to their use. This would be to put them on a better footing than our own merchants, whose property, after

twenty-four hours' possession by the enemy, would be confiscated to the receptor, whereas it is contended that no confiscation whatever should pass on the property of the people of Dominica. Being fully satisfied as to this general point, it renders a minute display of the striking contradictions between the bills of lading and· letters of advice, and other papers found on board this vessel, the less necessary. Many of them are manifestly fraudulent; and although the property is carefully wrapped in neutral covers, the net proceeds appear to be finally intended for subjects of Great Britain, residing at London, or elsewhere.

With respect to the king of England's proclamation, I conceive that it is founded on partial, not on general grounds. Were it not that this, with four or five other Dutch vessels were at this time to sail from Dominica, freighted with the property of British merchants, it is more than probable that this proclamation had never been published.

I adjudge that the cargo of the ship Resolution be condemned as lawful prize to the libellants; and that the ship Resolution, with her tackle, apparel and furniture be restored to Brandlight and Sons, merchants of Amsterdam.

NOTE. The claimants appealed from this decree; and, after long argument, the judges of appeal reversed the decree, so far as the same respected the condemnation of the cargo, which they fully acquitted, upon the shippers paying freight to the owners of the ship. [2 Dall. (2 U. S.) 1.] There was afterwards a rehearing of this cause before the court of appeal, on a suggestion of new testimony having been found amongst some papers taken in a ship (the Ersten) bound from Ostend to Dominica; but the court adhered to their judgment; except only as to some part of the cargo, which was condemned on account of irregularities in the bills of lading, and letters of advice, respecting those particular articles. [Id. 19.]